## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                       )

**RADCLIFFE WALKER,**                )

                                     )

         **Plaintiff,**           )          **Civil Action No.**

                                     )          **16-11004-FDS**

         **v.**                      )

                                     )

**FRANK FEMINO,**                 )

                                     )

         **Defendant.**          )
_____)

## MEMORANDUM AND ORDER ON DEFENDANT'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

**SAYLOR, J.**

      This is a civil rights action arising out of a confrontation between Boston police officers and a teenage boy. Plaintiff Radcliffe Walker, who was then 17 years old, was with his cousin when he was approached by four police officers in a cruiser near his home. The parties dispute whether Walker was trespassing on a construction site or standing on the sidewalk. The officers say (and Walker has not disputed) that they smelled burnt marijuana. One of the officers, defendant Frank Femino, asked the boys a question. Walker suddenly took off running. Femino got out of the car and began chasing him.

      Walker ran into the basement of a house, from which a woman emerged, screaming. Femino chased Walker into the basement. Walker alleges that he was punched and beaten by Femino and perhaps other officers. He was handcuffed, searched, and removed from the basement. No marijuana or other contraband was found. Shortly thereafter, Walker's mother informed the police that he lived at the house and was not trespassing. Walker was then released.

Walker alleges that Femino violated his Fourth Amendment rights, falsely imprisoned him, intentionally inflicted emotional distress, assaulted him, and used excessive force in connection with his arrest. Femino has moved for partial summary judgment on the Fourth Amendment and false imprisonment claims.

There are three basic components to this lawsuit, involving the legality of (1) the initial pursuit, (2) the subsequent arrest and searches, and (3) the use of force. Only the first two are the subject of the motion for summary judgment; defendant does not contend that he is entitled to summary judgment on the excessive-force claim. For the following reasons, the Court concludes that, under the circumstances, Femino's pursuit of Walker is protected by the doctrine of qualified immunity, and that he had probable cause to conduct the arrest and search. Accordingly, partial summary judgment will be granted in favor of Femino.

## I.  **Background**

### A.  **Factual Background**

Unless otherwise indicated, the following facts are set forth in the light most favorable to plaintiff.

Radcliffe Walker is an African-American teenager who lives with his mother at 16 Rockland Street in the Roxbury section of Boston. (Def. SMF Ex. 5; Pl. SMF Ex. 3 at 6:12-14).

Frank Femino is a Boston police officer. On October 12, 2012, Femino was on patrol with three other officers, Douglas McGrath, Thomas Bernier, and Michael Paradis, in the same police car. (Def. SMF ¶ 1; *id.* Ex. 1 at 12:5-13, 12:16-21; *id.* Ex. 2 at 25:5-16). Bernier was driving, and Femino was sitting in the front passenger side of the car. (Def. SMF Ex. 3 at 30:22-31:6). At least Femino and Paradis are white. (Pl. SMF Ex. 4 at Answer 10).

Around 6 or 7 p.m., the officers noticed Walker and another individual, his cousin Lester Walker, near a house that was under construction. (Def. SMF Ex. 2 at 43:19-44:3; *id.* Ex. 3 at

37:5-9; *id.* Ex. 5; Pl. SMF Ex. 1 at 41:20-23, 46:3-11, 49:1-15; *id.* Ex. 3 at 106:3-21; *id.* Ex. 4 at Answer 10).[1] Walker contends that they were on the sidewalk and on their way back to his home; Femino contends that they were standing in the driveway of a house under construction, and therefore trespassing. (Def. SMF Ex. 2 at 43:19-44:3; *id.* Ex. 3 at 37:5-9; Pl. SMF Ex. 3 at 106:10-12; *id.* Ex. 4 at Answer 10).

Bernier pulled the car up to Walker and Lester and stopped. There had been no discussion among the officers about the two boys, and Femino testified that he had no opinion as to why Bernier stopped the car in front of them. (Pl. SMF Ex. 1 at 32:7-18). Femino rolled his window down and addressed the boys. (Def. SMF Ex. 3 at 44:4-14).

The officers contend that they smelled burnt marijuana. (Def. SMF Ex. 1 at 52:10-17; *id.* Ex. 2 at 43:19-44:3; *id.* Ex. 3 at 37:5-9; *id.* Ex. 4 at 39:7-10).[2] No officer contends that he saw either boy smoking marijuana. Only Femino testified that he saw "smoke in the air." (Def. SMF Ex. 3 at 37:5-9). No marijuana was ever recovered, either from the boys or in the immediate area. (Def. SMF Ex. 1 at 52:21-23; *id.* Ex. 3 at 81:1-6, 94:17-22). Plaintiff, however, has submitted no evidence disputing the existence of the marijuana smell.

Femino asked Walker at least one question, although the parties dispute what was said. Femino contends that he asked them if they lived at the house that they were standing next to,

---

[1] The house was either on Rockland Street or Rockland Avenue. Walker estimated that it was 50-100 steps away from his home. (Pl. SMF Ex. 4 at Answer 10).

[2] It is unclear from the testimony whether the officers rolled down the window after they pulled up to Walker and Lester or whether they had been driving with the windows cracked. Femino testified that his window was "down" as they were driving. (Def. SMF Ex. 3 at 37:10-16). But he later testified that he put his window down when they pulled up to Walker and Lester, and that by the time car came to a complete stop, it had come down the rest of the way so that it was completely open. (Def. SMF Ex. 3 at 44:4-9). McGrath testified that he smelled the marijuana "either as we pulled up—and I'm not certain if the window was down, if it was rolled down, but it was pretty apparent right away. So basically as soon as we pulled up on the both [sic] Walkers." (Def. SMF Ex. 1 at 52:10-17). Walker testified that the windows of the car were tinted, and that he saw the car was full either through the window or after they pulled the window down, suggesting that the window was up when the car initially pulled up. (Pl. SMF Ex. 3 at 107:2-24).

and that Walker answered, "No." (Def. SMF Ex. 3 at 44:10-14; *id.* Ex. 4 at 38:14-19). Paradis

testified that Femino also asked Walker his name, and he answered, "Zane." (Def. SMF Ex. 4 at

38:22-39:3; *see id.* Ex. 3 at 78:13-14 (Femino testifying that he told Walker's mother that

Walker had told him his name was "Zane"); *id.* Ex. 5 (listing "Zane" as an alias of Walker)).

Walker, however, contends that the officer said something like, "Don't you guys think you

should be inside, wrong place?" (Pl. SMF Ex. 4 at Answer 10).

According to Walker, he became scared and took off running home as soon as they spoke

to him. (Pl. SMF Ex. 3 at 107:14-18). Femino contends that Walker started running when he

opened the door to the car to get out. (Pl. SMF Ex. 1 at 46:20-24; *see* Def. SMF Ex. 4 at 39:14-

19).[3] Lester did not run. (Def. SMF Ex. 4 at 42:14-19).

Femino testified that he had a suspicion that Walker had a weapon because "[t]he way he

ran it was an indication that he was in possession of a weapon." (Def. SMF Ex. 3 at 50:22-

51:1).[4] He and Paradis pursued Walker on foot, while Bernier followed with the car and

McGrath stayed with Lester. (Def. SMF Ex. 1 at 37:8-38:9; *id.* Ex. 4 at 26:18-27:1, 42:21-23).

Walker ran into the backyard of a house at 16 Rockland Street. He then entered the

basement. (Def. SMF Ex. 3 at 57:3-58:3; Pl. SMF Ex. 3 at 117:10-22). The basement is a

separate apartment; Walker did not live there. (Def. SMF Ex. 6 at 45:13-24; *id.* Ex. 8 at 16:15-

20).

Walker contends that while he was running into the yard, he was shouting back at the

---

[3] Femino testified that the reason he got out of the car was that he did not feel "comfortable with the two individuals from a seated position within BPD vehicle 1350 where the individuals would have a tactical advantage on me and my partners." (Def. SMF Ex. 3 at 93:2-7).

[4] Defendant's statement of material facts—and his motion for summary judgment—says that Femino and Paradis thought he had a weapon "based on the way he clutched his waistband as he ran away." (*See* Def. SMF ¶ 12). The cited testimony, however, does not say anything about Walker clutching his waistband, and indeed there appears to be no record evidence to support that claim.

pursuing officers that it was his home. (Pl. SMF Ex. 3 at 117:10-11). Femino testified that he did not know that 16 Rockland Street was Walker's home at the time, and he suspected him of trespassing. (Def. SMF Ex. 3 at 50:10-14; Pl. SMF Ex. 1 at 60:15-21).

Immediately after Walker entered the basement, a woman ran out of the basement screaming. (Def. SMF Ex. 3 at 57:24-58:3; *id.* Ex. 4 at 56:8-57:18). The woman did not return and was never identified by the officers. (Def. SMF Ex. 3 at 58:11-68:2; *id.* Ex. 4 at 57:19-24).[5]

Femino entered the basement in pursuit of Walker. (Pl. SMF Ex. 1 at 60:22-61:4). It was dark in the basement, and he had to get out his flashlight. (Pl. SMF Ex. 1 at 61:2-10; Def. SMF Ex. 7 at 9). At some point, Femino drew his weapon, a .40-caliber Glock 23 semi-automatic pistol. (Pl. SMF Ex. 1 at 61:15-20). He testified that at that time, his assessment of the situation was that it had "escalated from a trespass and drug use to an individual with a weapon fleeing the scene and invading a house that he had no authority to." (Def. SMF Ex. 3 at 93:20-94:1).

Walker contends that Femino punched him on the right side of the head and on the left jaw, and he fell to the ground. Femino then handcuffed him. (Pl. SMF Ex. 3 at 117:19-22, 127:5-128:11). Walker testified that the whole time he was telling the officer that this was his house. (Pl. SMF Ex. 3 at 117:10-13, 128:11-12).

Walker contends that after he was handcuffed, multiple officers punched him and hit him with their pistols in the basement and then kicked him while he was on the floor. (Pl. SMF Ex. 1 at 128:14-23; Def. SMF Ex. 7 at 131:5-20; *id.* Ex. 9 at Answers 3, 7). He testified that at some point he was knocked unconscious and that it had shaken his memory. (Def. SMF Ex. 7 at 123:3-10, 161:15-18 ("I'm not exactly sure because of me losing my memory that night. Not

---

[5] Walker's mother later testified that the woman was the wife of the then-tenant of the basement, who was there that night, although she normally lived in Quincy. (Def. SMF Ex. 8 at 46:20-47:5).

lose but, you know, my memory being shaken by me getting knocked out unconscious . . . .")).

Femino testified that he ordered Walker to get on the ground, but instead of complying, Walker turned around to face him. (Pl. SMF Ex. 1 at 65:12-66:2). Femino testified that he could see Walker's hands were empty, but "[i]t appeared he was in a fighting stance." (Pl. SMF Ex. 1 at 66:1-7). He holstered his weapon, grabbed Walker's arms, and pulled him to the ground to handcuff him. (Def. SMF Ex. 3 at 66:5-69:2). According to Femino, during this time Walker was "screaming repeatedly that he ha[d] PTSD" and was pulling away and resisting. (Def. SMF Ex. 3 at 68:3-6, 69:11-15, 73:15-17).

Femino "did a quick search on" Walker in the basement, but did not find a weapon, drugs, drug paraphernalia, or any other contraband. (Def. SMF Ex. 3 at 50:19-51:14, 72:24-73:4).

According to the officers, Paradis entered the basement after Walker was handcuffed, and helped him to his feet. (Def. SMF Ex. 3 at 70:8-12; *id.* Ex. 4 at 59:12-18). Bernier then arrived. He stood at the end of the hallway and asked Paradis if they were "all set." (Def. SMF ¶ 28; *id.* Ex. 3 at 70:3-7; *id.* Ex. 4 at 63:14-19).

Femino escorted Walker from the basement into the backyard. (Pl. SMF Ex. 1 at 76:6-10). Femino did not remember whether the backyard was lit by artificial light, but he testified that he could see. (Pl. SMF Ex. 1 at 76:1-5). He searched Walker again, because he "wanted to make sure he didn't have any contraband or weapons still," and again found nothing. (Pl. SMF Ex. 1 at 76:11-15).

Femino then noticed a woman, who turned out to be Walker's mother, Anne Marie Wynter, in the open first-floor window of 16 Rockland Street. (Def. SMF Ex. 3 at 77:3-78:7). According to Femino, she asked what was going on, and he asked her if she knew Walker. (Def.

SMF Ex. 3 at 78:6-9).  She answered, "That's my son Marcus."  (Def. SMF Ex. 3 at 78:9-10).[6]

Femino told her that he had said his name was Zane, and she answered that that was his

Facebook name, and again identified him as Marcus.  (Def. SMF Ex. 3 at 78:13-16).

Wynter told the officers that he was bipolar and off his medication, and assured the

officers that she would get him back on his medication.  (Def. SMF Ex. 3 at 81:14-17).  Femino

testified that he offered to call EMS for a psychiatric evaluation, but Walker's mother declined.

(Def. SMF Ex. 3 82:8-10).  He testified that he told Wynter that the reason he chased Walker

was that they "had reason to believe he was smoking marijuana in a driveway."  (Def. SMF Ex. 3

at 82:19-24).  Femino then took off Walker's handcuffs and the officers all left the scene about a

minute later.  (Def. SMF Ex. 3 at 81:14-82:5).  A search of the path of flight revealed no

discarded weapons or contraband.  (Def. SMF Ex. 3 at 81:1-6, 94:17-22).

According to Wynter, after she told an officer (probably Femino) that Walker was her

son, the officer told her that Walker had seen them and ran, and the officer asked her why he had

run.  (Def. SMF Ex. 8 at 30:8-12).  She told him that her son didn't bother anybody and the

officer said that that didn't make sense and asked her again why he had run away.  (Def. SMF

Ex. 8 at 30:12-16).  She testified that when she asked the officers what he had done, the officers

"said he run, so they want to know why he run."  (Def. SMF Ex. 8 at 30:19-21).  She told the

officers that maybe he hadn't taken his medication.  (Def. SMF Ex. 8 at 31:3-8).[7]  According to

Wynter, before they left, the officers told her that she "could call the ambulance and let him go to

the hospital now because they roughed him up pretty bad."  (Def. SMF Ex. 8 at 31:14-21).

---

[6] Plaintiff's statement of material facts asserts that "Marcus" is a family nickname for Walker.  (Pl. SMF ¶ 34).  Walker's mother refers to him as "Radcliffe" in her deposition.  (*See* Def. SMF Ex. 8).

[7] Walker testified that he thought he had been prescribed medicine for anxiety, but he did not like the way it made him feel and he believes he was not taking any medication at the time.  (Def. SMF Ex. 7 at 71:3-20).

Walker was not charged with any crime.  (Def. SMF Ex. 7 at 172:18-23).  A "Field Interrogation/Observation/Frisk And/Or Search Report," signed by Femino, identifies Radcliffe Walker as an 18-year-old black male with "Alias/Nickname[s]" of "Zane" and "Marcus."  (Def. SMF Ex. 5).[8]  It lists the reasons for the original stop as "Drug Invest/Tresspass [sic]" and the "Reasons for Interrogation, Observation, Frisk or Search" as "Trespassing."  (*Id.*).

### B.    Procedural Background

Walker filed this action in state court on October 9, 2015, against John Does 1-4.  On April 27, 2016, he filed an amended complaint identifying the defendants as Sergeant Douglas McGrath, Officer Thomas Bernier, Officer Frank Femino, and Officer Michael Paradis.  (Am. Compl. ¶ 2).

The amended complaint includes eight counts.  It asserts claims for (1) arrest without probable cause in violation of the Fourth and Fourteenth Amendments, under 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act; (2) search without probable cause or reasonable suspicion, in violation of the Fourth and Fourteenth Amendments, under 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act; (3) false imprisonment; (4) malicious prosecution; (5) intentional infliction of emotional distress; (6) invasion of privacy in violation of Mass. Gen. Laws ch. 214, § 1B; (7)  assault and battery; and (8) excessive force.  (Am. Compl. ¶¶ 23-51).

Defendants removed the action to federal court on June 1, 2016.  On September 29, 2017, the parties stipulated to dismissal of Counts 4 and 6 as to all defendants and Counts 7 and 8 as to McGrath.

McGrath, Bernier, and Paradis moved for summary judgment on all claims, and Femino moved for partial summary judgment on Counts 1, 2, and 3.  Walker opposed Femino's motion,

---

[8] Plaintiff contends that he was 17 years old on October 12, 2012.  (Pl. Opp. at 1).

but stipulated to the dismissal of (1) all claims arising under the Massachusetts Civil Rights Act and (2) all claims against defendants McGrath, Bernier, and Paradis. Thus, the only remaining defendant is Femino, and the only remaining claims are the § 1983 claims set forth in Counts 1 and 2, and the state-law tort claims set forth in Counts 3, 5, 7, and 8.

## II.    Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotations omitted). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256–57.

## III.    Analysis

Defendant seeks summary judgment on Counts 1, 2, and 3. Count 1 is a claim under 42 U.S.C. § 1983 alleging that Femino "arrested Walker without probable cause, in violation of the

Fourth and Fourteenth Amendments to the Constitution." (Am. Compl. ¶ 24). Count 2 is also a claim under 42 U.S.C. § 1983, alleging that Femino "conducted an illegal search of Walker without probable cause or reasonable suspicion, and conducted said search in an unreasonable manner, in violation of the Fourth and Fourteenth Amendments to the Constitution." (Am. Compl. ¶ 28). Count 3 is a tort claim against Femino for false imprisonment, alleging that Femino "imposed an unlawful restraint on Walker's freedom and movement without probable cause by threat of force and humiliation." (Am. Compl. ¶¶ 32-33).

**A.** **Count 1**

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. CONST. amend. IV. That protection extends to brief investigatory stops that fall short of traditional arrest. Such a stop is considered a "seizure" under the Fourth Amendment if the individual is stopped under color of law and the circumstances are such that a reasonable person would not feel free to leave. *United States v. Camacho*, 661 F.3d 718, 724-25 (1st Cir. 2011).

For an investigatory stop to be lawful, "a police officer must have a reasonable, articulable suspicion of an individual's involvement in some criminal activity." *United States v. Dion*, 859 F.3d 114, 124 (1st Cir. 2017) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "[A]ny action undertaken with respect to the stop 'must be reasonably related in scope to the stop itself unless the police have a basis for expanding their investigation.'" *Id.* (quoting *United States v. Ruidíaz*, 529 F.3d 25, 28-29 (1st Cir. 2008)). "Reasonable suspicion" is "less than probable cause and more than a naked hunch." *United States v. McGregor*, 650 F.3d 813, 821 (1st Cir. 2011); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989). It is present when "there [is] both a particularized and an objective basis for suspecting the individual stopped of criminal activity." *United States v. Dapolito*, 713 F.3d 141, 148 (1st Cir. 2013). Its presence or absence must be determined on a case-by-case basis, considering the totality of the circumstances. A

court may not "divide and conquer" the facts but must consider the totality. *United States v. Arvizu*, 534 U.S. 266, 274 (2002); *Ruidíaz*, 529 F.3d at 30 ("[A] fact that is innocuous in itself may in combination with other innocuous facts take on added significance.").

An arrest, as opposed to a stop, requires more than reasonable suspicion; it requires probable cause. *Hayes v. Florida*, 470 U.S. 811, 816 (1985). "[T]he probable cause requirement extends to certain types of custody that, though short of an arrest, possess attributes that are characteristic of arrest," such as placing an individual in handcuffs and transporting him to a police station against his will. *Alfano v. Lynch*, 847 F.3d 71, 76-77 (1st Cir. 2017) (collecting cases).

"[P]robable cause to perform a warrantless arrest turns on 'whether at that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *Vargas-Badillo v. Diaz-Torres*, 114 F.3d 3, 6 (1st Cir. 1997) (second alteration in original) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

Even when an individual's rights have been violated, a police officer may nonetheless be entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for certain damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It "'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (per curiam) (quoting *Aschroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011)).

The qualified immunity inquiry normally proceeds as follows:

First, [the Court] inquire[s] whether the facts, taken most favorably to the party opposing summary judgment, make out a constitutional violation. Second, [the Court] inquire[s] whether the violated right was clearly established at the time that the offending conduct occurred. The second, "clearly established," step itself encompasses two questions: whether the contours of the right, in general, were sufficiently clear, and whether, under the specific facts of the case, a reasonable defendant would have understood that he was violating the right.

*Hunt v. Massi*, 773 F.3d 361, 367 (1st Cir. 2014) (quoting *Ford v. Bender*, 768 F.3d 15, 23 (1st Cir. 2014)); *see also Scott v. Harris*, 550 U.S. 372, 377 (2007). Nonetheless, it is in the Court's discretion "not to engage in the first inquiry, but to go directly to the second." *Hunt*, 773 F.3d at 367 (citing *Pearson*, 555 U.S. at 236). While proceeding in sequence is "often beneficial" and "promotes the development of constitutional precedent," it is not mandatory, because it "sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case." *Pearson*, 555 U.S. at 236-37.

### 1. The Initial Encounter and Foot Pursuit

The officers' initial encounter with plaintiff was to drive up and attempt to speak with him. At that point, the circumstances—viewed in the light most favorable to plaintiff—were as follows. A car with four police officers, at least two of whom were white, pulled up to two black teenage boys walking down the sidewalk. The officers could smell burnt marijuana. Femino rolled down a window and said, "Don't you guys think you should be inside, wrong place?" (Pl. SMF Ex. 4 at Answer 10).

The Court is of course cognizant of the potential racial tensions inherent in such an encounter, and the very real possibility that a young African-American male might view such an encounter with some degree of annoyance, dread, or even fear. Nonetheless, as a matter of constitutional law, a reasonable person would have felt free to leave, and therefore the encounter at that stage was not a stop for which a reasonable articulable suspicion was required.

The parties do not dispute, however, that Femino's foot pursuit of plaintiff was a seizure that must be supported by reasonable, articulable suspicion. (Def. Reply at 3 ("It is uncontested that Femino's foot pursuit of the plaintiff constituted a seizure and must be supported by reasonable suspicion)); *see Commonwealth v. Franklin*, 456 Mass. 818, 203 (2010) (explaining that an individual being chased was generally not free to leave). *But see California v. Hodari D.*, 499 U.S. 621, 624 (1991) (holding that, where physical force is not used, a show of authority does not amount to a seizure until the seized person submits to that authority); *United States v. Wright*, 582 F.3d 199, 206 (1st Cir. 2009) (accepting parties' agreement that seizure requiring reasonable suspicion did not occur until officers caught up with fleeing defendant and physically restrained him).

Again, on summary judgment, the Court must view the facts in the light most favorable to plaintiff. According to plaintiff, there was no reasonable suspicion that he and Lester were trespassing, because they were standing on the sidewalk, not in the driveway. (Pl. SMF Ex. 3 at 106:11-12). Defendant argues that several other facts, taken together, nonetheless establish reasonable suspicion: "(a) the Plaintiff's flight was unprovoked; (b) while running, the Plaintiff clutched his waistband, as if carrying a weapon; [and] (c) Femino smelled burnt marijuana prior to pursuing the plaintiff." (Def. Reply at 3).[9]

The fact that plaintiff left the scene, without more, does not constitute reasonable suspicion. "[I]t is firmly established that a person has the right to walk away from police questioning," *Petro v. Town of West Warwick ex rel. Moore*, 889 F. Supp. 2d 292, 323 (D.R.I. 2012) (citing *Illinois v. Wardwell*, 528 U.S. 119, 125 (2000)), and a "'refusal to cooperate,

---

[9] The incident report lists the reasons for the initial stop as "Drug Invest/Tresspass [sic]." (Def. SMF Ex. 5).

without more, does not furnish the minimal level of objective justification needed for a detention or seizure,'" *Wardlow*, 528 U.S. at 125 (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)); *see also Commonwealth v. Warren*, 475 Mass. 530, 539-40 (2016).[10]

However, an unprovoked flight is something different. "[U]nprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." *Wardlow*, 528 U.S. at 124-25 (holding that sudden, unprovoked flight in a high-crime area was grounds for reasonable suspicion justifying a stop); *id.* at 124 ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."); *Warren*, 475 Mass. at 538 ("Yet, because flight is viewed as inculpatory, we have endorsed it as a factor in the reasonable suspicion analysis.").

Here, plaintiff alleges that Femino asked him, "Don't you guys think you should be inside, wrong place?" right before he took off running. It is unclear what to make of that; although framed as a question, it does not necessarily call for a response, and could be reasonably interpreted anywhere between a friendly admonition ("you shouldn't be smoking marijuana out here on the street, where you could get in trouble; go home to your mother") and a veiled threat ("if you do not obey me, I will arrest you, or worse"). The Court is reluctant to characterize plaintiff's flight in response to the officer's question as wholly "unprovoked."

---

[10] In *Warren*, the Supreme Judicial Court concluded that "[a]lthough flight is relevant to the reasonable suspicion analysis in appropriate circumstances," it added "two cautionary notes regarding the weight to be given this factor." 475 Mass. at 538. First, it concluded that "[w]here a suspect is under no obligation to respond to a police officer's inquiry, we are of the view that flight to avoid that contact should be given little, if any, weight as a factor probative of reasonable suspicion." *Id.* at 539. Second, it concluded that because a recent Boston Police Department report found evidence of racial profiling of black males, "[s]uch an individual, when approached by the police, might just as easily be motivated by the desire to avoid the recurring indignity of being racially profiled as by the desire to hide criminal activity," and that "a judge should, in appropriate cases, consider the report's findings in weighing flight as a factor in the reasonable suspicion calculus." *Id.* at 539-40. That decision post-dates the events at issue here, and it appears that the decision was interpreting Article 14 of the Massachusetts Declaration of Rights, not the Fourth Amendment.

Nonetheless, it was sudden and at least somewhat suspicious, and a factor that can be considered in the totality of the circumstances. *See United States v. Scott*, 270 F.3d 30, 41 (1st Cir. 2001) ("An individual's flight from police combined with other observations by a police officer may support reasonable suspicion sufficient for detention under *Terry*.").

Femino also argues that the way plaintiff was running contributed to his reasonable suspicion. *See Commonwealth v. Garcia*, 88 Mass. App. Ct. 307, 311 (2015) (holding that flight coupled with suspicious way in which defendant held his waistband, the direction in which he was walking, and turning away from the police when they approached him provided reasonable suspicion). But Femino repeatedly overstates the evidence supporting that claim. His statement of material facts, his opening brief, and his reply state no less than five times that plaintiff was "clutching his waistband." (Def. SMF ¶¶ 12; Def. Mem. in Supp. Summ. J. at 2; Def. Reply at 3). But Femino testified at his deposition only that "[t]he way he ran it was an indication that he was in possession of a weapon." (Def. SMF Ex. 3 at 50:22-51:1). "The way he ran," without any further detail, does not constitute a reasonable articulable suspicion. Indeed, one reasonable interpretation of that statement is that Femino inferred that plaintiff had a weapon simply because he fled. In any event, taking the record in the light most favorable to plaintiff, Femino's statement does not bolster the case for reasonable suspicion.

Finally, all four officers testified that they smelled burnt marijuana. (Def. SMF ¶ 6; *id.* Ex. 1 at 52:10-17; *id.* Ex. 2 at 43:19-44:3; *id.* Ex. 3 at 37:5-9; *id.* Ex. 4 at 39:7-10). The officers did not see plaintiff or Lester actually smoking—though Femino testified that he saw "smoke in the air"—and it is undisputed that neither boy was actually found with marijuana. (Pl. SMF Ex. 1 at 92:2-7). But plaintiff has submitted no evidence disputing the existence of a marijuana smell, other than to contend in broad terms that he was doing "nothing wrong" at the time. (Pl.

SMF Ex. 4 at Answer 10). Thus, even taking the facts in the light most favorable to plaintiff, the Court must accept as true the contention that the officers smelled marijuana.

That issue is of course complicated by the recent decriminalization of marijuana under state law. The Supreme Judicial Court has held that because the possession of one ounce or less of marijuana has been a civil, not a criminal, offense under Massachusetts law since 2008, "the odor of burnt marijuana alone cannot reasonably provide suspicion of criminal activity" under Massachusetts law to justify ordering a passenger out of a car. *Commonwealth v. Cruz*, 459 Mass. 459, 472 (2011); *see* Mass. Gen. Laws ch. 94C, § 32L (2012).[11] However, that decision interpreted Article 14 of the Massachusetts Declaration of Rights, which appears to provide broader protections than the Fourth Amendment. *See id.* at 466 n.10. The issue in this § 1983 action is whether the officer can be sued for damages for violating the Fourth Amendment, not Article 14. Possession of more than one ounce of marijuana is a federal misdemeanor, although possession of a "personal use amount" is a civil violation. 21 U.S.C. §§ 802(6), 812 Schedule 1(c)(10), 844(a), 844a; 28 C.F.R. § 76.2. And precedent in this circuit provides that the smell of burnt marijuana is enough to establish reasonable suspicion that the individual is engaged in criminal activity. *See United States v. Staula*, 80 F.3d 596, 602 (1st Cir. 1996) (odor of marijuana established probable cause to search car); *United States v. Sanders*, 248 F. Supp. 3d 339, 347 (D.R.I. 2017).[12] Under the circumstances, the smell of burnt marijuana is also a factor

---

[11] In November 2016, after the events at issue here, Massachusetts voters approved a referendum that further decriminalized marijuana, at least for individuals over 21. *See* Mass. Gen. Laws ch. 94G, § 7 (effective Dec. 15, 2016).

[12] Under Massachusetts law, when the police have *probable cause* to believe that a person has violated the marijuana-possession civil ordinance, they are justified in detaining that person for long enough to issue a citation and confiscate the marijuana. *Commonwealth v. Martin*, 91 Mass. App. Ct. 733, 736-37 (2017); *see also United States v. Vargas*, 86 F. Supp. 3d 38, 43-44 (holding that an officer was justified in stopping someone he saw smoking marijuana because "[o]fficers may briefly and proportionately detain an individual when those officers have probable cause to believe that he has violated a civil ordinance, and this principle applies independent of suspicion of criminal activity"). But the *reasonable suspicion* that a person is violating the marijuana-possession civil ordinance is not enough. *Commonwealth v. Rodriguez*, 472 Mass. 767, 767, 775, 778 (2015) ("[W]here the

that can be considered as part of the reasonable-suspicion analysis.

Again, the constitutional question is whether, considering the totality of the circumstances, there was a reasonable articulable suspicion for Femino to "seize" plaintiff by pursuing him on foot. For purposes of the motion for summary judgment, the Court must assume that plaintiff and Lester were not trespassing in a driveway, but walking down the sidewalk. There is no evidence that defendant reasonably believed plaintiff might have been armed. All that remains are the smell of burnt marijuana and plaintiff's sudden flight in response to the officer's statement.

The Court need not, however, decide that thorny constitutional question, but instead will proceed directly to the qualified immunity inquiry. This is not a motion to suppress in a criminal case, but an action for money damages under § 1983. To recover damages under § 1983 against a police officer, the constitutional right in question must be "clearly established." And while the right to be free from seizure by the police absent a reasonable articulable suspicion is "clearly established," the application of the right under the factual scenario presented here is not. In 2012, it was not "clearly established" that the combination of a smell of burnt marijuana and sudden flight, taken together, would not support a *Terry* stop. As noted, before 2012, the Supreme Court had held that sudden, unprovoked flight in a high-crime area can constitute reasonable suspicion. *Wardlow*, 528 U.S. at 124-25. And the First Circuit had held that the smell of burnt marijuana is enough. *Staula*, 80 F.3d at 602. While the SJC's opinion in *Cruz* may have cast doubt on *Staula*, the interaction between a state's guidance on its own constitution and the proper interpretation of the U.S. Constitution is murky at best. Even after *Cruz*, the

only factor leading an officer to conclude that an individual possesses marijuana is the smell of burnt marijuana, this factor supports a reasonable suspicion that the individual is committing the civil offense of possession of a small quantity of marijuana, but not probably cause to believe that he or she is committing the offense.").

smell of burnt marijuana remains a factor to be considered in the totality of the circumstances, and it was not clearly established that plaintiff's flight and the smell of marijuana together could not rise to reasonable suspicion.

In short, even taking the facts in the light most favorable to plaintiff, any constitutional violation would have been the result of defendant's "reasonable but mistaken judgment" about the quantum of evidence necessary to support a reasonable suspicion. Therefore, even assuming a constitutional violation, defendant would be entitled to qualified immunity as to the claim based on the foot pursuit. Summary judgment for defendant is therefore warranted as to that claim.

### 2. The Handcuffing and Detention

Plaintiff was placed in handcuffs, removed from the basement, and detained for a short period of time. Although brief, that was an arrest that required probable cause. (*See* Def. Reply at 4 ("For Femino's detention to be lawful, it must be supported by probable cause—apparently trustworthy information—that a crime has been or is about to be committed.")); *Flowers v. Fiore*, 359 F.3d 24, 29-30 (1st Cir. 2004) (discussing when the use of handcuffs transforms a *Terry* stop into an arrest); *United States v. Acosta-Colon*, 157 F.3d 9, 18-20 (1st Cir. 1998) (same).

According to plaintiff, he was shouting at defendant that this was his house, and the Court must assume that assertion is true. (Pl. SMF Ex. 3 at 117:10-11). But it is undisputed that defendant saw a woman run out of the basement screaming after plaintiff entered. (Def. SMF Ex. 3 at 57:24-58:3; *id.* Ex. 4 at 56:8-57:16; *id.* Ex. 8 at 46:22-47:10). Witnessing a screaming woman come out of the basement is information sufficient to support a belief on the part of the police officer that plaintiff did not have the right to be in the basement and was trespassing, despite plaintiff's protestations that it was his home. It was reasonable for defendant to infer

from the woman's actions that something frightening and unusual had happened, and therefore to distrust any statements from plaintiff that he lived at that address. Therefore, there was probable cause for plaintiff's handcuffing and detention. To the extent plaintiff's § 1983 claim is based on the arrest, the Court will grant summary judgment in favor of defendant.

### B. <u>Count 2</u>

Law enforcement may search individuals pursuant to a lawful arrest in order to disarm the individual and preserve evidence. *United States v. Robinson*, 414 U.S. 218, 234 (1973); *see Maryland v. King*, 569 U.S. 435 (2013); *United States v. Bizier*, 111 F.3d 214, 217 (1st Cir. 1997). Plaintiff concedes that the lawfulness of defendant's initial search, performed in the basement just after plaintiff was handcuffed, stands or falls with the lawfulness of plaintiff's detention. Because defendant had probable cause to detain plaintiff, that initial search was also lawful.

Plaintiff contends that even so, the follow-up search, which took place outside after Femino and Paradis had taken plaintiff out of the basement, was unconstitutional. The Supreme Court has held that even after a defendant has been searched at the scene of his arrest, a second warrantless search at the police station can still be a lawful search incident to arrest as long as the interests from which the exception derives are still present. *United States v. Edwards*, 415 U.S. 800 (1974). Here, plaintiff was subject to a "quick" search in the basement, in the dark; when he was removed from the basement, defendant searched him again, "because [he] wanted to make sure he didn't have any contraband or weapons still." (Def. SMF Ex. 3 at 72:24-73:1; Pl. SMF Ex. 1 at 76:13-15). Those are exactly the considerations that motivate the exception to the warrant requirement authorizing searches incident to arrests. It is not unreasonable for defendant to have been less than satisfied that his initial search in the dark of the basement was adequate to ensure his safety. Therefore, the second search was constitutional, and summary judgment will

be granted to defendant.

## C.    Count 3

The elements of false imprisonment under Massachusetts law are "intentional and unlawful confinement of a person, either directly or indirectly, of which the person confined is conscious or is harmed by such confinement." *Jonielunas v. City of Worcester Police Dep't*, 338 F. Supp. 2d 173, 177 (D. Mass. 2004); *Cremaldi-Vickery v. Otis Elevator, Inc.*, 2003 WL 168452, at *2 (Mass. App. Ct. Jan. 24, 2003). Where a police officer has probable cause to arrest an individual, there is legal justification for the confinement, and no cause of action for false imprisonment under Massachusetts law. *Sietins v. Joseph*, 238 F. Supp. 2d 366, 381 (D. Mass. 2003); *see also Godette v. Stanley*, 490 F. Supp. 2d 72, 80 (D. Mass. 2007).

As discussed above, defendant had probable cause to arrest plaintiff, and therefore the arrest was lawful and cannot be the basis of a false-imprisonment claim.

To the extent plaintiff is basing this claim on defendant's pursuit of plaintiff, that pursuit does not amount to "confinement" under Massachusetts law. The Second Restatement of Torts requires the victim to be confined "within boundaries fixed by" the perpetrator. Restatement (Second) of Torts § 35(1)(a) (1965); *see Laprade v. Cooley Dickinson Hosp.*, 2016 WL 4006432, at *1 (Mass. App. Ct. July 26, 2016) (quoting the Restatement); *Cremaldi-Vickery*, 2003 WL 168452, at *2 (same). Plaintiff was clearly not confined within boundaries fixed by defendant when he was being chased. *See also Nelson v. City of Cambridge*, 101 F. Supp. 2d 44, 48-49 (D. Mass. 2000) (explaining that the plaintiff's false arrest claim depended on whether the stop at issue exceeded the bounds of a *Terry* stop and was in fact an arrest); *Nuon v. City of Lowell*, 768 F. Supp. 2d 323, 336 (D. Mass. 2011) (explaining that false arrest is a species of false imprisonment (citing *Wallace v. Kato*, 549 U.S. 384, 391 (2007)); (Pl. Mem. in Opp. Summ. J. at 5-6, 16 (conflating false arrest and false imprisonment)). Therefore, defendant's motion for

summary judgment on Count 3 will be granted.

**IV.** **Conclusion**

For the foregoing reasons, defendant's motion for partial summary judgment is

GRANTED.

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor, IV
Dated:  May 2, 2018                                    United States District Judge